IN THE MATTER OF THE ESTATE OF MABEL WARD, A MINOR.

*Evidence—Book-entries—Guardian and ward—Support of step-child —Interest—Accounting.*

1. Book-entries, when receivable, are not allowed beyond the purpose for which the exception in their favor is made in the usual course of business. *McClintock's Appeal*, 58 Mich. 155.

2. The doctrine has been well settled in Michigan that, as a rule, at least, interest should not be compounded against a guardian. *Moyer v. Fletcher*, 56 Mich. 506. If he actually receives more than ordinary interest, it is right that he should account for it.

3. There may be some cases which seem to favor the doctrine that it is the duty of a step-father to bring up his step-daughter at his own expense, but very few do, unless under peculiar circumstances. No doubt cases may be found where, upon the facts as appearing, the step-father indicated by his declarations or conduct that all of his outlays and services were meant to be gratuitous. If a child has no estate, such a presumption would be very strong. If some one else had charge of the estate, and he made no claim against the income, or acted so as to show he never intended to set up any claim, there might be reason for some such idea. But when the step-father is guardian, and receives the income, it cannot be assumed, without some indication, that he means to charge himself with the whole support.

4. It has been held in this Court that an actual and legal father may, in case the welfare of the child demands it, be allowed access to the child's estate, to provide for its education and support more generously than he could himself afford. Guardians have been allowed to resort to the principal, as well as the income, if required for the ward's welfare. *Gott v. Culp*, 45 Mich. 265; *Moyer v. Fletcher*, 56 Id. 508; *Chubb v. Bradley*, 58 Id. 268.

Error to Wayne. (Hosmer, J.) Argued October 30, 1888. Decided January 11, 1889.

Guardian's final account. Guardian appealed to circuit court from allowance of probate court, where the amount found due the ward's estate was increased. On his appeal to this Court the decree of the circuit court is reversed, and that of the probate court modified and affirmed. The facts are stated in the opinion.

*J. W. Donovan (Edwin F. Conely* and *William P. Wells,* of counsel), for appellant.

*Griffin & Warner,* for minor.

CAMPBELL, J. In 1875 the appellant, Hamilton E. Smith, was appointed guardian of Mabel Ward, then about nine years old, and daughter of the guardian's wife, Mrs. Adelia E. Smith, by a former husband, John P.

Ward.   The mother died in 1877, and the ward remained in the charge of her guardian until 1886, when he resigned, and was succeeded by Carlos E. Warner.   His account was presented to the probate court of Wayne county, where, on August 10, 1886, a balance was struck against him of $31,167.13.   From this he appealed to the Wayne circuit court, where the amount was increased to $40,281.54.   He now appeals to this Court.   No appeal was taken on the ward's behalf, who is now of age, and married to one Seitz.   The principal objection made to the probate decree was the failure of the probate court to allow the guardian for what he claimed to have been legitimate charges for care and maintenance of the ward and her property, and for overcharges for money received by him.   In the circuit court, between $8,000 and $9,000 was charged to the guardian, as diminishing the estate of his wife, and increasing that of the ward. Compound interest was also charged against him, so that the circuit decree was $9,114.41 larger than the probate decree.

The record is very prolix, but a statement explaining the questions involved will be sufficient.

Capt. John P. Ward, father of Mabel, died in 1865. Mabel was a posthumous child, born in the early part of 1866.   Capt. Eber B. Ward, her grandfather, became administrator of his son, and assumed—but, so far as appears, without appointment—to act as her guardian. Mrs. Adelia Ward kept house in Detroit, and had custody of the child.   The administrator made her a regular allowance, payable at monthly intervals, which amounted during her widowhood to upwards of $8,000, and this is the item on which the circuit court differed with the probate court.

In the fall of 1869 Mrs. Ward married Dr. Smith, the recent guardian.   Capt. E. B. Ward died in 1875.   During

his life he allowed Dr. Smith $500 a year for the main-
tenance of Mabel. There is nothing to show that he set
this down against the child's estate, and he probably did
not, although this is not certain. Capt. Ward never
rendered any account, and there is no evidence before us
of any account kept by him with the widow or Dr.
Smith, or with the child, although it is singular that he
did not, if such is the fact. All that appears is what is
claimed to be an account with John P. Ward's estate,
which, although found in the probate files, was never, so
far as appears, legitimately among the records; and it is
from certain items in this account imperfectly proven by
one of the book-keepers, who did not prepare it, that
inferences were drawn below, some of which do not strike
us as warranted. Mrs. Smith died in 1877. At the time
of her death no money had come into the guardian's
hands from any source. After her death her husband
became her administrator, and entitled to half of her
property, such as she had. For some reason, which we
do not understand, this administration was not brought
into this account ostensibly, although a part of the money
in the guardian's hands, which he claims as proceeds
belonging to her estate, was embraced in the accounting,
and charged entire by the circuit court to him as assets
of the ward. There is no evidence that she left any con-
siderable assets, and until sometime in 1877, about two
years after E. B. Ward's death, the guardian had no assets
and supported the ward himself.

In 1877 Charles D. Stevens had succeeded Eber B.
Ward as administrator of John P. Ward, and during that
year and the next two years he paid over to Dr. Smith
sums amounting, as claimed, to $25,698.22, a part of
which the guardian claims belonged to his wife, and a
part to Mabel. He owned half of his wife's portion, and
Mabel owned the other half. In 1880 Dr. Smith collected

$4,000 as a legacy from Eber B. Ward to Mabel. He thus had in his hands over $29,000, a part of which was of disputed ownership.

During a part of the period of guardianship Dr. Smith kept house, and during the remainder Mabel for a time roomed in his house, taking meals there or at some other place. She spent considerable time away from Detroit, at boarding schools. During a part of the time she boarded at various places in Detroit.

In the beginning of 1886 Dr. Smith was compelled to go abroad for his health, and made arrangements to take Mabel with him. Some of her friends made difficulties, and led her to become hostile to him, so that she remained in this country, and proceedings were begun which led to his resignation, and his accounting was completed after he resigned. Up to that time their relations were kind and affectionate. Since his departure for Europe up to this time the litigation has been conducted on her behalf with some feeling and persistency, which have not been conducive to confining the legal controversy to its merits.

The main contention necessarily covers but a few questions. They include—

1. An inquiry into the assets of the ward.
2. The charges properly made against the assets.
3. The method of making up the balances.

So far as the assets are concerned, the question is chiefly what part of the John P. Ward moneys belonged to the ward; and as she had one-half of that estate in her own right, and one-fourth as heiress of her mother, it became important to know what her mother's interest was. The chief dispute in the circuit court seems to have been over the advances made periodically to Mrs. Ward before she became Mrs. Smith, by Eber B. Ward, as administrator.

As the probate court decided that this money was meant for an allowance, and not by way of advancement, and as no appeal was made on the ward's behalf from the probate allowance, we do not see how that question was open in the circuit court for review. But we have no doubt the probate decision was correct. It is the right of the widow and family to be supported by suitable allowances before distribution. No other money was advanced for the widow or child from the estate. The only witness sworn declares it to have been an allowance at regular periods. It was within the amount received by way of income from the fund, and there is nothing to show that any separate debit and credit account was kept with the widow, or that she ever supposed it was chargeable against her portion. We can hardly suppose that so good a business man as Eber B. Ward kept his accounts in the meager and dubious shape of the transcripts laid before us, with no further explanations, if they are to be construed as claimed by the counsel for the heiress. We do not think that is a proper construction.

Some stress is laid upon an entry found in one of Eber B. Ward's books in 1869, to the effect that he had turned over to Mrs. Smith stock in the Wyandotte Rolling Mill Company to the amount of $7,300, in full of her share in the estate. It is admitted she had that stock, but it is not admitted that she received it on any such terms. It is well settled that such an entry cannot prove anything more than the charge of such an amount, if it proves that. Any further entry can have no weight to prove such a settlement as is relied on here. Book-entries, when receivable, are not allowed beyond the purpose for which the exception in their favor is made in the usual course of business.

This was held in *McClintock's Appeal,* 58 Mich. 155 (24 N. W. Rep. 549), where a very similar question arose.

It is evident, however, from the remainder of the accounts, that the entry is not in accordance with the facts. An administrator has no right to treat one heir or distributee more favorably than another. If Mrs. Smith was supposed to have received her share in full, it would have been at that time, even including the allowance advances referred to, several thousand dollars less than what would be left for the child. Leaving the advances out, she would have received only about a third of the child's portion, as it would have been ascertained by giving all the residue.

But here it is proper to refer to some other questions of assets on which there was a mistaken inference drawn below. A sum of $9,000 is treated by the circuit judge as having been paid in Eureka (or Erie) Iron Company stock in October, 1866. If that had been so paid at that time it would, with the $7,300, have nearly made up the widow's share. But there is no such evidence. The only testimony on the subject places the transfer of that stock in 1874. The entry made in October, 1866, charging the estate with $9,000 for Eureka Iron stock, does not state that it was given to Mrs. Ward; and the same account shows it was not, but must have been merely an investment of so much cash belonging to the estate, for purposes of income. It is a little singular that the statements of accounts produced here do not credit the estate with it as an asset, as they should have done. But this is not the only instance in which these alleged accounts are defective. They do not show any charge of this $9,000 to her at any time, and it is going pretty far to hold her chargeable at all; nevertheless she did get the stock afterwards. The books of Capt. Ward were not

produced or examined, and we do not feel that we are entirely safe in sustaining some of the charges allowed. But in this particular case the books show that the dividends from this very stock were received by the estate, and credited to it as its own lawful income. If this stock belonged to her in 1866, and was not received in 1874, she would be entitled to the dividends for about eight years, which appear to have been from 10 to 12½ per cent. dividends, earning 3 to 5½ per cent. more than the remaining funds in the years reported, but possibly less subsequently. This would reduce the daughter's share very materially, and by some thousands of dollars.

It seems to have been assumed that John P. Ward left an estate of about $50,000, and this assumed fact has been dwelt on in estimating the ward's share. It appears, however, that the estate consisted of two steamboats sup_posed to be worth $50,000, and not much else. These boats were sold for that sum in cash, not very long after the administration was granted. But it appears also that the estate was indebted largely, there being one note on interest, the principal of which was $10,000, and debts and expenses of the boat business, and other matters which, according to the account in 1869, left a balance of only $23,709.40, but which should have been increased by $9,000, invested as before stated, so as to be $32,709.40. The payment of $7,300 was made about this time, in October, 1869. Mabel's share at this period was not far from $16,000. Between 1869 and 1874, when the Eureka stock was transferred, interests and dividends had been accumulating, and some payments had been made on Mabel's account which would diminish her balance. The result was that, allowing all that is claimed to have been paid to Mrs. Smith, her share remaining in 1874 was, at a very liberal estimate for the heir, about 12½ per cent., and the daughter's share 87½ per cent., in the remaining

estate. As all losses in collection would fall on them ratably, it follows that their respective shares would continue at that rate in what was received, and the various sums of money paid to Dr. Smith from the estate of John P. Ward would be so apportioned. We have calculated the result on the various theories of the parties as carefully as we can, and, while we cannot tell just how the probate judge figured out his results, we are satisfied that the sum which he found due was substantially sustained by the facts, and properly computed on his theory, as nearly as may be, if that was right; and that the only questions we need deal with are as to the deductions claimed for the guardian, and not allowed in the probate court. And as no appeal was made for the ward, it is satisfactory to believe there was no ground for appeal against the guardian.

But whether he was entitled to further allowances, or whether, on the other hand, interest should be compounded against him, are the two important questions to be considered.

The doctrine has been well settled in Michigan that, as a rule, at least, interest should not be compounded against a guardian. *Moyer v. Fletcher*, 56 Mich. 508 (23 N. W. Rep. 198). If a guardian actually receives more than ordinary interest, it is right that he should account for it. The testimony does not satisfy us that he received a net income from the funds that would amount to as much as 7 per cent. It does appear that about two years of the guardianship passed with no funds in his hands at all, and more than that before he began to realize any income large enough to meet necessary expenditures. And after the whole fund was in his hands, the annual balance of income over outlays and proper charges was not so great as to leave very much surplus to invest, if laid out diligently. The decree of

the probate court allowed the ward, beyond the deducted charges, about $1,500 more than the sums which came into Dr. Smith's hands for all purposes, and no figuring, consistent with the estate accounts of John P. Ward's estate, can make the funds due Mabel as original heir or as heir of her mother amount to any such sum as Dr. Smith received. The losses in the collection of the assets, which reduced the sum collected from Capt. Stevens, would fall on her to the extent of over 93 per cent. The probate decree gave to Mabel more than $3,000, at the lowest estimate, of savings from her share of the income on all the funds which came into Dr. Smith's hands, beyond outlays and allowances, treating all those moneys as principal in his hands. Taking the amount of her interest in the estate of her father as shown in 1869, and then not very much, if any, beyond $16,000, and the decree of the circuit court, without counting the legacy of $4,000, gives her this original sum intact, and nearly $20,000 interest upon it, after deducting all charges against her for support and advances. It would be a remarkable result for a small estate, after liberally providing for the ward, to more than double during her minority, and few, if any, such cases can be found.

The decision below seems to have been placed principally on the supposed duty of Dr. Smith to bring up his step-daughter at his own expense. There may be some cases which seem to favor that doctrine, but very few do, unless under peculiar circumstances. No doubt cases may be found where, upon the facts as appearing, the step-father indicated by his declarations or conduct that all of his outlays and services were meant to be gratuitous. If a child has no estate, such a presumption would be very strong. If some one else had charge of the estate, and he made no claim against the income, or

acted so as to show he never intended to set up any claim, there might be reason for some such idea. But when the step-father is guardian, and receives the income, it cannot be assumed, without some indication, that he means to charge himself with the whole support. There is no such indication here, and there is direct proof to the contrary. So long as Eber B. Ward lived, Dr. Smith was allowed $500 a year for maintaining Mabel. That was not a nominal remuneration. It was a substantial sum, approaching at least a fair charge for the services. The record does not show that this payment governed Dr. Smith's conduct towards Mabel, and it is quite likely that he would have treated her as tenderly without it. But the fact that he did give her what money would not pay for is no reason why he should not be paid when her estate could afford to pay him.

The record shows Dr. Smith, in his domestic relations, to have been very devoted. During all his married life his wife was more or less out of health, and during much of it his personal attendance on her led to a practical breaking up of a large practice, at a time of life when it is not very easy to rebuild it. It is evident from the record that his marriage and its results were very prejudicial to his pecuniary affairs. His wife seems to have understood this, and endeavored in some degree to make up for it. He carried out all her wishes in taking the child with them, and showed himself a loving husband, and as kind a parent as if Mabel had been his own daughter, and until she became otherwise advised she seems to have felt this to be so.

It has been held in this Court that an actual and legal father may, in case the welfare of the child demands it, be allowed to have access to the child's estate, to provide for its education and support more generously than he could himself afford. Guardians have been allowed to

resort to the principal, as well as the income, if required for the ward's welfare. *Gott v. Culp,* 45 Mich. 265 (7 N. W. Rep. 767); *Moyer v. Fletcher,* 56 Id. 508 (23 N. W. Rep. 198); *Chubb v. Bradley,* 58 Id. 268 (25 N. W. Rep. 186). In our opinion the present case is not one where the guardian was bound to support the ward himself, and he ought to be allowed what any other guardian would have been allowed in providing for her welfare. In making such allowances, we are, however, to bear in mind that there were reasonable means for calculating on her probable income, which was sufficient for her maintenance, and no allowance should be made which would go beyond what was so calculable. A part of the proper charges in this case date back of the receipt of any money by Dr. Smith, but interest had accumulated in the estate of John P. Ward which ultimately came into Dr. Smith's hands as a part of the money he received from that estate.

It is utterly impossible to figure out with precision the exact sums which ought to be allowed. A part of this difficulty would have been avoided by rendering more frequent accounts, and the ward will of course not be allowed to suffer on that account. But we cannot assent to the conclusion that the guardian is to be needlessly punished for not being more exact in performing his duties. As we have had occasion to indicate heretofore, it is not desirable to intimidate friends and relatives from being guardians, and drive children into the hands of strangers, who cannot make up by business precision for the lack of the natural kindness that is so much more important to the good of young people. Dr. Smith seems to have been as careful of his ward's interests as he was of his own, so far as investment is concerned, and much more so in regard to home outlays. It would have been better and more in accordance with duty to keep the

funds separate; but he placed them in competent hands, where he might fairly have expected that a division would be made if thought proper. He should have known better, but such management is not so uncommon as to call for severe censure. The estate of Mabel's father was in the hands of her grandfather, who was one of the most celebrated business men of the country, and it does not appear that most of her money was invested at all, and he died without rendering an account of nearly nine years' administration. We see no reason for attempting to punish Dr. Smith by making him lose what justly belongs to him.

The question then arises, what allowances should be made? Nothing was allowed below for the two years preceding the guardianship. Up to that time Dr. Smith had been paid $500 a year in full of all charges and expenses. During those years it seems reasonably certain that he was put to heavier charges than before. Whether Eber B. Ward meant to pay the $500 a year out of his own pocket, or to charge it to Mabel's account, could make no difference in its correctness. It was presumably a fair sum under the circumstances, and was considerably less than her estate was earning annually. We think that $1,000 should be allowed for those two years.

The sum allowed for services does not exceed, so far as we can calculate, the statutory compensation and percentage, which no court can cut down. Allowing Mabel 93¾ per cent. of the money paid by Capt. Stevens to Dr. Smith, which is probably an overestimate, and deducting advances and charges to the end of 1877, it leaves a balance of sums received from John P. Ward's estate, treated as principal when received, of about $22,-600 within a small sum. And adding to this the legacy, Dr. Smith, received in all the sum of $26,600, on the

items of which interest should be allowed at 7 per cent. from their dates.

The circuit court allowed for board-money paid out for Mabel's board to two different persons in Detroit, and the various school bills' were admitted. But the bills for board and incidentals, pocket money, and traveling expenses, were not allowed, where no receipts or vouchers were produced. The nature of the bills actually produced indicates that she was treated indulgently, and that her maintenance was somewhat expensive, although not beyond her resources. Taking year in and year out, including when she was in Detroit regularly and when away, with the ordinary expenditures indicated by the testimony, we think the sum of $2,400 for the guardian's care and outlays and her maintenance not otherwise paid for would be a very moderate allowance, and probably much less than would have been shown, had not the guardian's private accounts disappeared. The testimony goes beyond this, and is not substantially contradicted.

In our opinion the probate balance should be reduced $3,400, making it as of its date the sum of $27,767.13, and the decree of the circuit court should be reversed, and that of the probate court affirmed, with that reduction. The guardian' should recover costs in this Court and in the circuit court, which may be deducted from the balance found due. Some payments have been made since the probate decree which must also be allowed, but on which there is, as we understand, no dispute.

The decree of this Court will be properly certified down.

The other Justices concurred.