BARNEY, J.,
delivered the opinion of the court.
The plaintiffs are ten tribes of Indians, known as the Confederated Bands of the Ute Indians (referred to hereinafter as the Ute Indians), who sue herein for an accounting to them under the agreement made by them with the defendant by an act of Congress approved June 15, 1880 (21 Stats., 199).
The same claim, known as Congressional case No. 11248, was referred to this court by resolution of the. Senate under the fourteenth section of the Tucker Act,, but was dismissed on defendant’s motion in March, 1908, for want of jurisdiction. (43 C. Cls. R., 260.)
The case is now here by virtue of a provision in the Indian appropriations act approved March 3, 1909 (35 Stats., 788, 789), conferring jurisdiction on this court to adjudicate the claim to final judgment, with right of appeal as in other cases, with a direction to allow certain set-offs and counterclaims therein mentioned. A consolidation is directed with the congressional case above mentioned, still pending on a motion for a new trial,’ for the purpose of using *456 the evidence therein adduced at this trial. The jurisdictional proviso is given in full as Finding II in the findings of fact, supra, and will not be here repeated.
The territory within which the lands in question are located, and out of which the Territories of New Mexico, Utah, and Colorado were subsequently created, was mostly acquired from Mexico by the treaty of Guadalupe Hidalgo, concluded February 2,1848. (9 Stat., 922, 930.) This treaty contained no provision affecting or recognizing the rights of the Indian tribes to any of the lands within the cession, unless such recognition can be gathered from the opening words of the eleventh article of that treaty, which are: “ Considering that a great part of the territories which, by the present treaty, are to be comprehended for the future within the limits of the United States, is now occupied by savage tribes,” etc. It should be said, however, that a portion at least of the lands covered by the treaties between the Utes and the United States, hereinafter mentioned, were acquired under the Louisiana Purchase or by the annexation of Texas.
December 30, 1849, the first treaty was made with the “Utah” Indians (doubtless the claimants), which involved no cession of lands and did not set apart any reservation to the Indians. (9 Stats., 984.) It did, however, clearly recognize some rights of the Indians to the occupation of certain lands. For instance, Article V of that treaty is as follows:
“ V. The people of the United States, and all others in amity with the United States, shall have free passage through the territory of said Utahs, under such rules and regulations as may be adopted by authority of said States.”
Expressions of similar import are used in the seventh article of the same treaty.
September 9, 1850, a territorial government for Utah was established (9 Stats., 453), including within its boundaries that part of the present State of Colorado west of the summit of the Kocky Mountains. February 28, 1861, the Territory of Colorado was organized (12 Stats., 172).
On October 7, 1863, a treaty with the Tabeguache band of the plaintiff Indians was concluded and proclaimed De *457 cember 14, 1864 (13 Stats., 673). By this treaty when first signed the Indians asserted the exclusive right to certain lands therein described, but all assertions of that character were striken out by the Senate before ratification, and the treaty was further amended by adding the following provision:
“ Nothing contained in this treaty shall be construed or taken to admit on the part of the United States any other or greater title or interest in the lands above excepted and reserved in said tribe or band of Indians than existed in them upon the acquisition of said territory from Mexico by the laws thereof.”
By Article II of the treaty as amended by the Senate the Tabeguache band of Utes ceded and relinquished to the United States all “ claim, right, title, and interest in and to any and all lands within the territory of the United States,” excepting certain lands described which are reserved to them “ as their hunting grounds.”
Provision was made in this treaty for payment to the Indians of an annuity for ten years, $10,000 in goods and $10,000 in provisions. Provision was also made for the allowance to them of certain agricultural stock and for the establishment of a blacksmith shop for their benefit upon the lands thus reserved.
March 2, 1868 (15 Stat., 619), a treaty was concluded at Washington with the plaintiff Indians, including the Tabe-guache band, the only Indian party to the treaty of 1863 just mentioned. This treaty reaffirmed the provisions of the treaty of 1863, and, in fact, so far at least as the Tabeguache band was concerned, superseded it.
Article II of this treaty set apart a district within what is now the State of Colorado, and embracing about 15,000,-000 acres of land, as a reservation for the plaintiff Indians and such other friendly tribes and individual Indians as they, with the consent of the United States, might be willing to admit among them for their “ absolute use and occupation.” Article III of the treaty is as follows:
“Article III. It is further agreed by the Indians parties hereto, that henceforth they will and do hereby relinquish all *458 claims and rights in and to any portion of the United States or Territories, except such as are embraced in the limits defined in the preceding article-.”
The treaty also provided for the establishment of two agencies on said reservation; for the construction thereon by the United States of schoolhouses and other buildings; for the selection of tracts of land thereon not exceeding 160 acres in extent by Indian heads of families desirous of commencing farming, to be held in the exclusive possession of the persons selecting it and his family so long as cultivation should continue, and 80 acres to persons not head of families; for supplying seeds and agricultural implements to the Indians, and for instructions by a practical farmer; for the establishment of blacksmith shops for their benefit; also for the establishment of schools, by building schoolhouses, and supplying competent teachers.
Provision was also made for payment to the Indians of annuities, (1) not to exceed $30,000 per annum for clothing, blankets, etc., (2) and not to exceed $80,000 for food. For the purpose of inducing the Indians to adopt the habits of civilized life and becoming self-sustaining the Secretary of the Interior was authorized to expend the sum of $45,000 for them for the first year after the treaty.
Article XYI of said treaty was as follows:
“Article XVI. No treaty for the cession of any portion or part of the reservation herein described, which may be held in common, shall be of any validity or force as against the said Indians, unless executed and signed by at least three-fourths of all the adult male Indians occupying or interested in the same; and no cession by the tribe shall be understood or construed in such manner as to deprive the tribe, without his consent any individual member of the tribe of his right to any tract of land selected by him, as provided in article seven of this treaty.”
By act of Congress April 23, 1872 (17 Stats., 55), the Secretary of the Interior was authorized to enter into negotiations with the plaintiff Indians for the purchase from them of the south part of said reservation, a district estimated to contain about 3,450,000 acres. Commissioners were appointed for that purpose and they entered into an agree *459 ment with the Indians which was ratified by Congress April 29, 1874 (18 Stats., 36), by the terms of which the plaintiff Indians surrendered all right, title, and interest to said 3,500,000-acre tract of land, in consideration of which the Indians were to be paid a perpetual annuity of $25,000. The area of the remaining reservation as thus diminished comprised about 11,724,800 acres of land.
In the late seventies the advance guard of civilization seeking new homes in the far West began to press upon the borders of this Ute Reservation, and in 1878 Congress, through a commission appointed for that purpose, made an effort to purchase it from the Utes and to secure their removal to another locality, but without success.
AGREEMENT OE JUNE 15, 1880.
[21 Stats., 199.]
During the winter of 1879-80 a delegation of the chiefs and headmen of the plaintiff Indians visited the city of Washington, and on March 6, 1880, entered into an agreement with the United States whereby they undertook to use their best endeavors with their people to procure their consent to cede to the United States the remainder of the reservation set apart to them by the treaty of 1868. This agreement was afterwards duly assented to by the plaintiff Indians and thereafter ratified by Congress and embraced in the act of Congress of June 15, 1880 (21 Stats., 199). Some amendments to the agreement were proposed by Congress in tlie act referred to, and the agreement as thus amended was afterwards consented to by three-fourths of the adult male plaintiff Indians as required by the treaty of 1868 and by section 10 of the act containing the agreement.
By that agreement the plaintiffs ceded to the United States the entire remainder of their reservation in the State of Colorado reserved to them under the treaty of November 6,1868, containing approximately 11,784,800 acres of land, and agreed to remove, settle upon, and accept individual allotments of unoccupied agricultural and grazing lands' in certain designated localities to be selected for them by a commission authorized by the act, which lands should be free *460 from taxation and not subject to alienation for a period of twenty-five years or longer in the discretion of the President.
It was further agreed by section 3 of said act that all lands within the ceded limits not allotted in severalty to the plaintiffs should be deemed to be public lands of the United States subject to disposal under the public-land laws for cash only in accordance with existing' law at the same price and on the same terms as other lands of like character, and contained the following proviso:
“ That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions, of the homestead law; but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the Government for the benefit of said Indians, and then to be applied in payment for the lands, at one dollar and twenty-five cents per acre, which may be ceded to them by the United States outside of their reservation in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated, and the interest thereon shall be distributed annually to them in the same manner as the funds provided for in this act.”
The act provided for the appointment of commissioners, for the purpose of carrying out the contract by selecting and allotting lands to the Indians, locating agencies, furnishing estimates of the number of schoolhouses and teachers required, etc. It also directed the Secretary of the Treasury to set apart and hold as a perpetual trust fund for the benefit of the plaintiffs an amount of money sufficient at 4 per cent to produce annually $50,000, to be paid to them per capita in cash annually as provided in said agreement. It. provided for salaries of certain members of the Ute Indians under existing treaty stipulations for a period of ten years, and authorized the distribution of $4,000 per annum for the. same term by the President to such of said Indians as proved themselves worthy of such recognition.
The act made appropriations for the purpose of carrying-the agreement into effect, (1) for the payment of the com *461 missioners, $25,000; (2) for cost of removal of the Utes, surveying their lands, building houses, establishing schools, building mills, purchasing stock, etc., as provided in said .agreement, $350,000; (3) $15,000 in addition to the $60,000 then due and provided for to be paid to them per capita; (4) for the payment of the appraised value of individual improvements within the reservation as provided in the agreement, $20,000; (5) for the care and support of the Utes for the balance of the then current fiscal year, $12,000.
In compliance with the provisions of the act all of the plaintiffs were removed to Utah, and allotments were there made to them, except the southern Utes who remained upon the reservation and received allotments along and within its southern border and partly within New ’Mexico. The sum total of lands thus allotted was 115,568.03 acres.
With this preliminary statement of the history of the transactions between the United States and the plaintiff Indians, we come to the discussion of the sum due said Indians under the agreement of 1880 in the light of the directions contained in the jurisdiction act under which this suit comes to this court.
I. We will first take up the sums for which the plaintiffs should be credited. As some date must be taken up to which this account must be stated, we have followed both parties in this suit and taken June 30,1908.
The findings show, and that fact is undisputed, that up to said date the defendants had received $2,204,694.71 as cash proceeds for lands sold located within the Ute Reservation, and it is not and can not be denied that the plaintiffs should be credited with that sum. It is contended, however, by the plaintiffs that they should be credited in addition thereto with interest compounded semiannually upon the amount of the quarterly sales of said lands since 1880, which interest would amount to $2,444,779.95 more. We will leave this question of interest to be discussed hereafter in connection with the credits to be allowed the defendants.
The jurisdictional act provides that this court in this suit is “ to hear, determine, and render final judgment, with right of appeal as in other cases, on the claims and rights of said *462 Indians under said agreement [agxeement of 1880, supra],, including the value of all lands ceded by tbe said Indians which have been set apart and reserved from the public lands as public reservations or for other public uses under existing laws and proclamations of the President, as if disposed of under the public-land laws of the United States,” etc. Thus in making up this account we are to credit the plaintiffs with the value of the forest reservations set apart out of the Ute Reservation. The areas so set apart, less such portions of the same as have been disposed of by the defendants and for which credit has been given to the plaintiffs in the first item, embrace 3,199,258 acres. The value to be set upon this land' is necessarily somewhat problematical, but that duty has been imposed upon this court, and with the best light obtainable must be done.
Section 3 of the act of 1880 provides that all the ceded lands
“ shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands, at the same price and on the same terms as other lands of like character, except as provided in this act: Provided, That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law, but shall be subject to cash entry only in accordance with existing law.”
The act of July 28, 1882 (22 Stats., 178), restored the Ute Reservation to the public domain with the following proviso:
“And further provided, That none of said lands shall be disposed of for any other than cash, nor for a less price than one dollar and twenty-five cents per acre.”
The act of April 24,1820 (3 Stats., 566), now section 2357, Revised Statutes, fixes the minimum price at $1.25 per acre for all public lands offered at public or private sale for cash in the following terms:
“ The price at which the public lands are offered for sale shall be one dollar and twenty-five cents an acre, and at every public sale the highest bidder, who makes payment as provided in the preceding section, shall be the purchaser; but no lands shall be sold, either at public or private sale, for a less price than one dollar and twenty-five cents an acre; and all the public lands which are hereafter offered at public *463 sale according to law, and remain unsold at the close of such public sales, shall be subject to be sold at private sale, by-entry at the land office at one dollar and twenty-five cents an acre, to be paid at the time of making such entry.”
A similar question was involved in an appeal from .this court to the Supreme Court in the case of United States v. Blachfeather (155 U. S., 180; 28 C. C., 447). In commenting upon the obligation of the United States to expose the lands in question at public sale, Mr. Justice Brown, in delivering the opinion of the court, said:
“ In the absence of any proof of the actual value of these lands at this time, there would seem to be no method of 1 estimation except by taking the price at which public lands were subject to be sold at private sale, namely, $1.25 per acre. Not only is there some presumption that the Grovernrnent would not sell them for less than they were worth, but the very fact that at that time all public lands were subject to entry at $1.25 per acre would render it impossible to sell them at a greater price unless by reason of their peculiar location, abundant timber, or extraordinary fertility they were exceptionally valuable. (Id., 191.)”
The average price at which the lands within the Ute Reservation were sold between the date of the agreement (1880) and June 30, 1908, was $1.68 per acre. Presumably the choicest lands were selected by the purchasers. The forest reservations were set apart at different dates between 1891 and 1905. While it is doubtless true that considerable of the land within these forest reservations is quite valuable, cn the other hand, the official reports show, and it is a fact so well known as to come within judicial notice, that considerable portions of them are valueless and can never be sold at any price.
In view, therefore, of the law and the facts as stated, we have found the value of the lands thus set apart in forest reservations to be $1.25 per acre, amounting to $3,835,323.75.
II. We next come to consider the sums to be charged ■ against the plaintiffs and set off against the amount credited to them in this suit. Upon that subject the jurisdictional act gives this court the following direction:
“ * * * and the court shall set off against any sum found due said Indians the amount paid to them under the *464 fifth section of said act of June fifteenth, eighteen hundred and eighty, being fifty thousand dollars per annum up to the date of rendition of final judgment in this cause; also any other sum or sums that shall be found to be properly chargeable under the terms of said agreement, and also any sum or sums paid by the United States to or for the benefit of said Indians, whether as a gratuity or otherwise, except such sums as have been paid for a specific purpose and an adequate consideration, * *
We are first specifically directed to charge to the plaintiffs the annuities which they have received under the agreement of 1880, $50,000 per annum, amounting to $1,350,000, and • about this sum there is and can be no dispute; in fact, the agreement itself in explicit terms so provides. . “Also any other sum or sums that shall be found to be properly chargeable under the terms of said agreement [1880].” Under this direction it should be borne in mind that by the terms of said agreement the plaintiffs were to receive all of the proceeds of said reservation, with the provision, however, that “ when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart by the Government for the benefit of said Indians,” etc. It will thus be seen that the transaction was of no benefit to the United States, except the indirect benefit received by opening up to civilization a desirable territory. In view of this fact we think the plaintiffs are “ properly chargeable” (1) with the allotments received outside the reservation; (2) the cost of the survey of the reservation, establishing schools, building houses, etc.; (3) additional per capita payments and the amount expended for the support of the Utes for the balance of the fiscal year, as provided and appropriated for in section 9, as well as salaries paid to selected individual Utes, as provided in section 6; (4) and also the expenses incurred by the United States in negotiating the agreements. In general, for the reasons stated, we think the plaintiffs should be charged with all the benefits of every name and nature which they have received under the agreement of 1880.
We do not think, however, they are properly chargeable with the cost of the survey of the lands allotted to them out *465 side of the reservation under the agreement. They have been charged for these lands at the price of $1.25 per acre, and that should include the cost of survey, the same as to other purchasers of lands within the public domain.
We are further directed, in addition to moneys paid under the agreement of 1880, to charge the plaintiffs with “ any sum or sums paid by the United States to or for the benefit of said Indians, whether as a gratuity or otherwise, except such sums as have been paid for a specific purpose and an adequate consideration.”
It is contended by the defendants that under this instruction we should charge the plaintiffs with all such sums as have been paid to them under the treaties of 1863 and 1868, on the ground that no “ adequate consideration ” was ever received by the defendants for moneys so expended. For this contention much reliance is placed upop. the decision of this court in the case of Hayt v. United States (38 C. Cls. R., 455), wherein it was decided that the territory ceded by Mexico to the United States by the treaty of Guadaloupe Hidalgo was not “ Indian country,” and it is claimed that all of the lands involved in the treaties of 1863 and 1868 were within that cession.
While it may be true that the Indian title of the plaintiffs to any territory prior to the treaty of 1863 was not such a title as the defendants would recognize, yet the plaintiffs were located within this territory and had the usual claim of occupancy of other Indians. Their claim was considered of such importance that the defendants, during the year following the Guadaloupe Hidalgo treaty, entered into a treaty with them and secured from them a concession for the right of free passage through their territory. (9 Stats., 984.) By the treaty of 1863 (13 Stats., 673) the defendants considered these claims to territorial occupancy of sufficient importance to obtain from them a cession of all “ claim, title, etc., to lands within the territory of the United States,” excepting certain lands which were set apart to them as their hunting grounds. By the treaty of 1868 (15 Stats., 619) the reservation in question was set apart to the plaintiffs, and by the third article of the treaty the plaintiffs relinquished “ all *466 claims and rights in and to any portion of the United States or territories except ” such reservation. Even if we may admit that they had no valid title to any lands, yet they claimed some title and honestly claimed it, and the yielding of such a claim to a party who wishes to purchase it is a good consideration.
In the case of Sykes v. Chadwick (18 Wall., 141) the Supreme Court, in discussing the sufficiency of consideration, said:
“ If any release is deemed requisite' to confirm the title of lands with which one has been connected, though by a proper construction of the law he has no interest in them whatever, still such release will be a good consideration for a promise or for the payment of money.”
Congress, from time to time, made appropriations of money to the plaintiffs which in terms were made in pursuance of the treaties of 1863 and 1868 (13 Stats., 560; 17 id., 457). After such treaty stipulations with the plaintiffs and after such recognition of their validity for more than forty years we do not think the defendants can successfully set up the claim-that these payments were made without adequate consideration. Certainly no such claim would ever be made against any people other than Indians. We do not think, therefore, that the plaintiffs are properly chargeable with any payments made to them under and pursuant to the treaties of 1863 and 1868.
We are also asked to charge the plaintiffs with $70,064.18, appropriated by act of Congress May 27, 1902 (32 Stats., 263), to be paid to the Uinta and White River Utes. This appears to relate to an entirely different transaction than the one under consideration. At the time of this appropriation the Uinta and White River Utes were located upon a reservation in Utah, and the portions of those bands to which this appropriation relates were located there prior to the agreement of 18801, and were not parties to the said agreement. The act referred to, supra, provided for the restoration to the public domain of all the lands in this reservation not to be allotted to these Uinta and White River Utes, and that the proceeds of such lands should be first applied to *467 the reimbursement of the United States for any moneys advanced to said Indians to carry into effect the provisions of said law; and said sum of $70,064.78 was appropriated to be paid said Indians for relinquishing their title to such unallotted lands, the same to be reimbursed in the manner before stated. This appears to be a matter for future adjustment between said Uinta and White River Utes and the United States, and said sum is disallowed as a set-off in this suit.
III. We now come to the question of interest to be allowed to the, plaintiffs upon the sums found due to them in the findings. We will first take up the question of interest upon the value of the lands set apart in forest reservations.
By the terms of the agreement of 1880 no interest was to be paid except upon the proceeds of cash sales within the reservation. It was unquestionably within the political power of Congress to authorize the withdrawal of these forest reserves from the market indefinitely, or for such periods as it should see fit, notwithstanding the agreement, and thus deprive the Utes of the proceeds of sales which otherwise would have been made, and interest upon the same. Having done so, their claim for the proceeds of lands deemed to have been sold by the setting apart of the forest reserves, and interest thereon, must be derived entirely from the language of the jurisdictional act.
The jurisdictional act directs this court to hear, determine, and render final judgment on the claims and rights of the Utes under the agreement of 1880, including the value of all lands—
“ Which have been set apart and reserved from the public lands or public reservations or for public uses under existing la,ws and proclamations of the President, as if disposed of under the public-land laws of the United States, as provided by said agreement.”
Section 1091 of the Revised Statutes provides:
“No interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest.”
*468 We are told to render judgment for the value of these lands, “ as if disposed of under the public-land laws of the United States, as provided by said agreement.” The agreement referred to contained directions as to the manner in which these lands were to be disposed of, i. e., they were to be surveyed, were not to be liable to entry and settlement under the provisions of the homestead law, but were to be sold for cash only. Hence the direction that we are to render judgment for the value of these lands as if disposed of “ as provided by said agreement,” evidently means that we are to regard them as having been sold for cash at the date of entry of judgment, and this sum is to be placed to the credit of the plaintiffs. If Congress had intended that interest should be allowed upon this sum it would have so provided, and without such specific provision such intention can not be inferred. When we remember, as already stated, that it was within the power of Congress to have kept these lands out of the market indefinitely, this conclusion will appear all the more clear.
In considering this question it should also be borne in mind that if these lands had never been withdrawn from the market, but a small percentage of them would have been sold before the passage of the jurisdictional act. This is shown by the fact that in the twenty-four years elapsing between 1880 and 1904, after which date the greater number of these reserves were created, less than 9 per cent of the total area of the reservation had been sold for cash. If Congress had intended to have this court consider the whole area of these forest reserves to have been sold as of the date when withdrawn from the market and to place their value ($3,835,323.75) to the credit of the plaintiffs as of such dates, it would have said so in unmistakable terms. In making up this account, therefore, no interest has been allowed upon the value given to the lands within the forest reservations.
As before stated, it is contended by the plaintiffs that they should be allowed compound interest upon the separate sums which appear quarterly to have been received by the defendants for the lands sold within the reservation from the date ■of receipt, and also upon the value of the lands withdrawn *469 from sale and set apart in the forest reservations, reckoned from the time of such withdrawal, without allowing the defendants any credit for annuities and other sums paid by the defendants under the agreement of 1880. We have already disposed of the question of interest upon the value of the lands set apart in forest reservations and that question requires no further consideration here.
The jurisdictional act provides:
“ That to carry into effect the agreement between the Confederated Bands of Ute Indians of Colorado and the United States, ratified by the act of Congress approved June fifteenth, eighteen hundred and eighty, being ‘An act to accept and ratify the agreement submitted by the Confederated Bands of Ute Indians in Colorado for the sale of tlieir reservation in said State, and for other purposes, and to make the necessary appropriations for carrying out the same ’ (Twenty-first Statutes, page one hundred and ninety-nine), jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render final judgment, with right of appeal as in other cases, on the claims and rights of said Indians under said agreement,” etc.
Hence we are to find what sum is legally due to the plaintiffs under said agreement, subject only to such modifications as were made further on in the act as to credits to be allowed the defendants. The agreement of 1880 provides that after the United States shall have been reimbursed “ for all sums paid out or set apart ” under the act, “ the remainder, if any, shall be deposited in the Treasury * * * and the interest thereon shall be distributed annually to them in the same manner as the funds provided for in this act.”
As to the contention regarding interest, that no credit should be allowed the defendants under the agreement of 1880, as we interpret the jurisdictional act, it forbids this method of computing interest. We are instructed to set off against any sum found due the Indians certain payments made to them by the defendants. When these sums are credited to the defendants, they, obviously, should be credited as of the date when paid. It appears from the account, as stated in Finding IX, that at no time before the passage of the .jurisdictional act did the cash receipts of the defend *470 ants for lands sold within the reservation exceed the amount paid out for the benefit of the claimants under the act of 1880. Hence, having decided that the claimants are not entitled under the jurisdictional act to any interest upon the value of the lands withdrawn from sale and set apart in forest reservations, no interest whatever appears to be due to the claimants. This being our conclusion, the discussion of the question of compound interest, as contended for by the claimants, is somewhat academical, but will be briefly considered.
No interest, either simple or compound, can be collected from a sovereign except by its consent. (United States v. North Carolina, 136 U. S., 211.) In the case at bar the sovereign has agreed to pay interest, and that means simple interest only. But the plaintiffs seek to charge the defendants with compound interest in this case on the ground that the money so received constituted a trust fund, and that in such cases where the fund has been improperly withheld, the trustee is penalized with compound interest. It is elementary as a general proposition, in the absence of a contract to that effect, that interest upon interest' is not recoverable for the detention of money, and that is a general rule either at law or equity. (Perley on Law of Interest, 159, 160; In re Ward's estate, 73 Mich., 220, 228.) It is only where a trustee, guardian, or executor has acted in bad faith, in abuse of his trust or has been guilty of such 'gross negligence as to be evidence of a corrupt intention, that compound interest will be charged against him (Barney v. Saunders, 16 How., 535; Perrin v. Leper, 72 Mich., 446; Vaughan v. Bibb, 46 Ala., 153; Smith v. Kennard, 38 Ala., 695).
The Government only acts through its officers and agents' and thus in law can never be guilty of fraud, bad faith, or negligence; hence it can never be penalized by being charged compound interest.
As already stated, the account herein between the plaintiffs and defendants, as directed to be made under the jurisdictional act, is stated up to June 30, 1908, as that is the latest .date to which full returns have been made by the *471 proper government officials. The jurisdictional act seems to contemplate that this account should be stated up to the date of the entry of judgment herein; hence, before entry of judgment further returns will be necessary. This supplemental account will be made in accordance with this opinion and will be a mere matter of computation.
Judgment therefore will be entered herein for the claimants for the sum of $3,408,611.40, with the modification hereafter to be made as above indicated.