Campbell, Chief Justice,
concurring:
By the jurisdictional acts the court is authorized and directed to adjudicate the claims of certain parties u against the Mississippi Choctaws.”
*320 Winton and associates filed their original petition duly verified by oath of Mr. Owen in which, at much length, they propound their claims as being one against the Mississippi Choctaws for service “ rendered not to one individual but to every individual who is enrolled and who has obtained the right to this great estate.” Later and after the second jurisdictional act was passed Winton and his associates filed their amended petition, seeking among other things to avail themselves of the said second, act, and reiterating that their claim is for services rendered to the Mississippi Choctaws “ as a body.” The general character of the services claimed for relates to matters of legislation affecting Mississippi Choctaws. For brevity the name of Winton will be used as referring to the parties named in the first of said acts. Chester A. Howe claims judgment for services of the same general nature as those alleged by Winton against all of the Mississippi Choctaws and also asks that judgments be rendered against individual Indians for additional sums expended in the matter of their removal. Other petitions and intervening petitions were filed. Some of these claim for services rendered, others for expenses incurred, and some claim for both, against individual Indians, and sometimes two or more claimants claim against the same Indians for expenses incurred on their behalf in different ways.
Broadly speaking, the Mississippi Choctaws are descendants of Choctaws who remained east after the Dancing Babbit Creek treaty of 1830. More specifically, they are those Indians who, residing mostly in Mississippi, could claim citizenship in the Choctaw Nation by virtue of the provisions of said treaty.
For the purpose of this case they are those of the latter class who did claim citizenship and were enrolled in the Choctaw Nation as Mississippi Choctaws.
At the inception we are met with the question of the court’s right to entertain the proceeding, and I do not fully concur with my brethren upon that question.
The second act is plainly amendatory of' the first act, and as all claimants have filed petitions claiming under it the second act may be looked to as covering the scope of the *321 legislation under which the proceeding comes to this court and the results it contemplates.
The said acts refer to the “claims” of certain parties “ against the Mississippi Choctaws.” Manifestly they do not comprise all those persons who are referred to in the legislation or proposed legislation relative to Mississippi Choctaws then residents principally of the State of Mississippi.
Section 41 of the act of July 1, 1902, 32 Stats., 651, contains a description of Mississippi Choctaws and refers (1) to all persons who had been duly identified, and (2) to persons who might thereafter be identified under the terms of the act. It deals primarily with the question of identification as distinguished from the enrollment under which rights of citizenship or to property were to be secured. A Mississippi Choctaw could be identified as such and yet not secure property rights, because he must needs meet the conditions of enrollment. As a matter of fact many Mississippi Choctaws (more than 800) were identified who were never enrolled. They remained in Mississippi and did not take up settlement in the western country. The said section also requires that “all Mississippi Choctaws so enrolled by said commission shall be upon a separate roll.” The jurisdictional acts must have reference to enrolled Mississippi Choctaws and not to the general description of Mississippi Choctaws who were eligible to identification under said section 41, because otherwise there would be subject to suit a number of Mississippi Choctaws who were not enrolled and did not secure any of the benefits of enrollment such as allotments of lands and the right of participation in other funds. Win-ton’s petition makes them parties as follows:
“ Names of the defendants in this proceeding against whom your petitioner is entitled to a judgment and a description of the lands upon which your petitioners are entitled to a lien in this proceeding will be found in the schedule showing lands selected by enrolled Mississippi Choctaws filed in this court,”—
said schedule being properly identified as one transmitted to the court in answer to the court’s call upon the Secretary of the Interior and described as a “ List of Mississippi Choc *322 taws who have selected land in allotment with their roll numbers and descriptions of their selections.” The said schedule contains 1,580 names, of which 137 are listed as newborn Mississippi Choctaws, and the said petition avers:
“ The whole of which purports to be and is for the purSoses of this petition admitted to be a complete roll of the lississippi Choctaws to whom allotments of land in the Choctaw and Chickasaw Nation have been made and upon whose said allotments as described in said exhibit, your petitioners are entitled to and claim liens to secure the payment of such judgments as may be rendered in this cause.”
It thus appears that he sues all of the Mississippi Choctaws who were enrolled and to whom allotments had been made, including in the list of defendants a number of minors who are listed as new born. Howe likewise claims against all of these, and further claims against some of the individuals less than all, while other claimants define their claims to be against one or more of said individuals.
The Attorney General, appearing by virtue of said acts for the defendants, questions the court’s jurisdiction upon several grounds, among others that the defendant Indians have not been properly summoned and served with notice of the proceeding and that they are denied due process of law.
The jurisdictional acts do not purport to declare any liability of the Indians, who are defendants, to any of the parties named therein, and leave that question for the court’s determination. The liability alleged by Winton is on account of services rendered and expenses incurred in or about the matter of legislation which they claim was the result of their labors and secured to said Indians a vast estate. Howe claims to have contributed by his efforts to said legislation, and other claimants seek to recover for expenses incurred in or about the removal of individual Indians from Mississippi or their subsistence pending their removal or after they had been removed. If all of these claims can be made and allowed it follows that judgments must be rendered (1) against all of the Mississippi Choctaws, (2) against some of them, less than all, (3) against some individuals in favor of two or more claimants.
*323 According to the second jurisdictional act, which is amendatory of the first, any judgments rendered by the court are to “ be paid from any funds now or hereafter due such Choctaws as individuals by the United States,” and a lien on the allotments of land to said Choctaws is declared for such judgments. The “ funds ” from which the judgments are to be paid can only arise out of a distribution of the fund arising from sales of unallotted lands or properties mentioned in the Atoka agreement and acts relative to the Choctaw-Chickasaw Nation in which Mississippi Choctaws are entitled to participate as provided by the statutes. There is no provision whereby any such distribution is to be made to the Mississippi Choctaws as a body or group independently of other Choctaw participants, but all allotments of land to Mississippi Choctaws have been in severalty to individuals, and their rights to participate in future distributions of funds are under present statutes individual rights. In other words, their participation or interest in tribal property of which the Government is trustee depends on the fact that the statutes recognize them as individually entitled to certain rights present or prospective. That these supposed rights may be altered by subsequent legislation need not be questioned here. Looking to the proposed method of paying said judgments, it is apparent that the funds mentioned are those which upon future distribution or apportionment of the trust estate or parts of it will fall to the share of the several individuals. For the funds to be “due from the United States” to the individuals implies a right of such individuals to demand it, and at that time the funds due will have become debts due them from the United States. And whereas now the Government is trustee of the funds and controls them, the trust, to the extent of the apportionment when made to the individuals, will then have ended, and the character of the holding as to them will have changed from that of a trustee for all the Choctaws to that of a debtor to the individuals. It is at that point that said act would divert from the Indians as individuals the payment of the amount found due and require its application to the payment of said judgments.
*324 If the judgment liens so declared be effective, no reason is apparent why upon their rendition the judgment creditors may not proceed in any court in Oklahoma of competent jurisdiction to enforce said liens against the lands of the individual Indians to the extent, at least, of the proportional part of such judgment due from each. Shields v. Thomas, 18 How., 252, 264.
We have therefore a proceeding in which individual Indians are defendants having for its purpose the establishment of a liability against all or some of them and to the payment of which liability their individual properties are subjected. The “services rendered and expenses incurred” for which compensation is sought had their inception while the Indian defendants were yet in Mississippi. All the services in legislative matters were rendered prior to final enrollment, and the alleged “expenses incurred” were at different stages between the Indian’s movements in Mississippi until his final removal West and his enrollment there. The Indian defendants, except the “new borns,” were in Mississippi, and they were citizens of that State. As alleged in Winton’s original petition, “The Mississippi Choctaws, by the terms of the fourteenth article of the treaty of 1830, were made citizens of the United States and, of course, had a right to contract, as they were not Indians who were wards of the Government of the United States.” They were citizens of Mississippi, and they subsequently became citizens of Oklahoma.
The petitioners thus suing them, as though by name and as individuals, upon a claim alleged to be against them as a group or body or class, and upon other claims confessedly against individuals, as such, under an act which contemplates a satisfaction of all judgments out of individual holdings, the proceeding in some of its phases has very much the form of personal actions against individual Indians.
It can not be doubted that Congress has “ plenary authority over the tribal relations of the Indians.” lone Wolf v. Hitchcoch, 187 U. S., 526. “Congress has full power to legislate concerning the tribal property of the Indians.” For is citizenship incompatible with the exercise by the General *325 Government of its duties and powers of supervision. Tiger v. Western Investments Co., 221 U. S., 286, 311. The power of Congress to legislate with regard to such Indian matters “ has always been deemed a political one, not subject to be controlled by the judicial department of the Government.” Lone Wolf case, supra; Tiger case, supra. But the question is whether Congress has exercised its powers as a political one or has, by the shape the legislation has taken, made the question purely a judicial one. The acts do not declare or define any liability, individual or otherwise, of the Indians to any of the claimants. Green v. Menominee Indians, 238 U. S., 558. The issues are between citizens of Oklahoma and, perhaps, other States on the one side, and Indian citizens of the United States and of Oklahoma on the other side. The Indians’ individual holdings in the hands of their trustee must respond to the judgments rendered.
The question submitted to the court is whether there is any liability against the defendants or any of them to the claimants or any of them. The court, in order to proceed properly, must have the proper parties before it, and parties are entitled to proper notice of suits against them. “ Citation before hearing; hearing, or an opportunity of being heard, before judgment are principles of the most primitive justice.” The Indians who are sued, except the new born, were citizens of the United States when the alleged services were rendered and when the alleged expenses were incurred.
When they were enrolled and secured allotments of lands in severalty they did not cease to be citizens of the United States. Their “ rights, privileges, and immunities ” as citizens could not limit the powers of the General Government in dealing with them or their property rights in their new relation. Citizenship is not incompatible with the power of Congress to place limits on their power to control the property allotted to them. But has Congress the power to subject them to a proceeding in this court without service of process to determine whether they are liable for engagements, express or implied, entered into, if at all, with other citizens prior to the time when their new relation to the Government was assumed? Certainly those Mississippi *326 Choctaws who were identified but never secured enrollment could not be sued in this proceeding without personal service if suable in this court at all. Those who were enrolled could have been sued in State courts on their valid engagements entered into before their rights of citizenship were subordinated to the said control and could have been sued afterwards on said engagements. What they yielded up of their rights as such citizens when they were enrolled among the Choctaws were those rights of citizenship which were inconsistent with their changed relation. They could maintain all rights which as citizens they held and enjoyed that were consistent with their new position. If they had property interests in Mississippi, or if they had made contracts there, they could prosecute or defend suits relative thereto without in anywise affecting the Government’s supervisory control over them or their property interests in Oklahoma, and being sued they could demand summons and service. Section 2103, Revised Statutes, provides that Indians not citizens may only contract when the contracts are approved by the commissioner. Shall the Mississippi Choctaws be denied the benefits of that statute because they were citizens when the alleged contracts were made and then when sued upon them or upon a quantum meruit based upon them be denied summons and service and the right of personal defense as though they are Indians and not citizens? To subject the said Indians to judgments such as the acts contemplate and to subject their funds or allotments to the payment of them without service of summons or voluntary appearance will, it seems to me, be a denial of due process.
If, on the other hand, the proceeding be not against the individual Indians, as such, but is a proceeding of an equitable nature having for its purpose the reaching of trust funds, their sequestration, so to speak, in the hands of the trustee of them, then the court should not proceed in the absence from the record of the trustee. It is a familiar rule that to suits involving a trust estate the trustee is a necessary party. O'Hara v. McConnell, 93 U. S., 150; Shields v. Barrow, 17 How., 130; Carey v. Brown, 92 U. S., 171. Especially is the rule applicable where the trustee is to be bound by the decree. Cunningham v. Macon R. R. Co., *327 109 U. S., 446; McArthur v. Scott, 113 U. S., 340; Kerrison v. Stewart, 93 U. S., 155. True, the controversy between the petitioners and the Indians may be said, in a sense, to be a separable controversy, but the manifest purpose of the act taken as a whole is to reach the amounts held by the trustee and subject them to the payment of the supposed liability. In such case the relief asked for could be granted without the trustee being before the court. Thayer v. Life Association Co., 112 U. S., 717.
The Government is trustee of the Choctaw-Chickasaw funds out of which it is proposed to pay any judgments rendered in this proceeding after their apportionment to the individual cestuis que trustent. If its guardianship over the Indians’ interests in allotments of land continues it owes some duty of protection to them in the matter of the liens declared by the act, and certainly it should be in position to stay an enforcement of said liens against their individual holdings of land. This it could do if a party. But the United States can not be sued without their consent and have not consented to be sued in this proceeding. A judgment rendered under said act can not be effectuated unless they are parties to the suit, because they can not be required to pay the judgments if any “ out .of funds now or hereafter due ” from them except they be before the court. It may be added that the court are agreed that the United States can not be made defendants in this proceeding.
For these reasons I think the court should not proceed further in the case.
Assuming, however, that the court has jurisdiction and. may proceed in the absence of the trustee, I concur in the result reached upon the merits.
The jurisdictional acts refer to “ claims against the Mississippi Choctaws.” Not only the langauge of the acts but the considerations above adverted to as to service upon the defendants rebut a conclusion that suits are authorized against each Mississippi Choctaw who may have made a contract with or for whom or in whose individual interest services were rendered or expenses incurred by a claimant. The acts do not contemplate that the parties named therein, *328 “ their associates or assigns,” may propound in said proceeding claims alleged to be against one or a few Mississippi Choctaws who are sought to be charged with liability to such claimant and thereby convert the proceeding into a number of distinct and separable controversies between the several claimants and different Indians as defendants. Since the acts do not provide for personal summons to or service on the Indians but by their terms would charge the judgments rendered upon whatever may be due them as individuals from the United States, as well as further secure the payment of the judgments by a lien on lands owned by the Indians in severalty, the court is not justified in extending the controversy beyond the terms of the acts authorizing the proceeding. A claimant is not authorized to select particular Indians supposed to be liable to him and sue them in this proceeding. The claim must be “against the Mississippi Choctaws,” and that means against all of them who were enrolled. This view requires the dismissal of the petitions filed herein of nearly all of the claimants and intervening petitioners. It requires consideration of the claim of Win-ton and his associates, and perhaps a few others. An analysis of the case of Winton and his associates is all that is necessary to a proper understanding of the whole issue.
Their petition and amended petition allege that they have a claim against the Mississippi Choctaws “ as a body.” They make defendants all of the Mississippi Choctaws who were enrolled and had been allotted lands. By reference to the list of those enrolled as shown by the schedule furnished and filed in this court by the Secretary of the Interior, which list or schedule shows the separate names of the allottees and describes the lands allotted to them severally, the said petition as amended makes all of the enrolled Mississippi Choctaws parties defendant.
It is shown by their petition and proof that Mr. Winton’s connection with Mississippi Choctaws commenced in 1896, at which time Mr. Owen was his sole associate. He secured a large number of contracts of employment with individual Indians. It is alleged in the original petition that “they made contracts with Charles F. Winton and later with those *329 associated with said Winton, particularly C. E. Daley. * * * A list of these contracts is respectfully submitted to the court as the basis of the employment of Charles F. Winton, his associates, and assigns.”
The contracts made prior to the act of May 31, 1900, came under the condemnation of that statute because they provided for compensation to Winton of one-half interest in the net recovery and authorized him to locate and select allotments and to convey a one-half interest therein. It is alleged in the amended petition that they “contemplated not only obtaining the estate for the Mississippi Choctaws but contemplated their removal and establishment upon their allotments in the Choctaw and Chickasaw country.” After the said act had declared certain contracts void new contracts were taken by Winton, principally in the name of C. E. Daley, several hundred in number, which have been filed in this proceeding, and the general tenor and substance of them appears from a copy attached to the appendix to the court’s findings in the case.
In the amended petition it is averred that “ the jurisdictional act was sought by the said Winton and his associates solely to cover compensation for their claim for services rendered to the Mississippi Choctaws as a body in securing the legislation and the Executive action, which resulted in the ultimate establishment of the Mississippi Choctaws in the Choctaw and Chickasaw Nation.”
The concluding clause of section 3 of the amended petition is that “this claim- is limited to compensation for services in the actual securing of the estate.”
The original petition is sworn to by Mr. Owen and the amended petition is signed by him, and they therefore may be taken as stating the claim of Winton and his associates. In addition, however, Mr. Owen, testifying in behalf of the said petitioners, states the claim of Winton and his associates as follows:
“ This suit brought under the jurisdictional act is not brought to enforce these contracts, but is brought to determine the measure of compensation of Winton and his associates for services rendered and expenses incurred in the matter of the claim of the Mississippi Choctaws for citizen *330 ship in the Choctaw Nation; is brought against the Mississippi Choctaws as a group and not as individuals, seeking compensation for services rendered them as a group and not for services rendered to them as individuals.”
The claim of Winton and associates is therefore “ for services rendered and expenses incurred” principally in work before the legislative body, its committees, and before administrative officers. That an attorney may be employed to present his client’s case before Congress, or committees of Congress, or departmental officers is not to be doubted, and such an agreement, express or implied, for purely professional service is valid. As is said by the Supreme Court in Trist v. Child, 21 Wall., 441, 450: “Within this category are included drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments and submitting them orally or in writing to a committee or other proper authority, and other services of like character. All these things are intended to reach only the reason of those sought to be influenced. They rest on the same principle of ethics as professional services rendered in a court of justice, and are no more exceptional.”
Claiming a liability to them by the Mississippi Choctaws, whether “ as a group,” “ a body,” or “ a class,” or otherwise, it is incumbent on said claimants to show the facts upon which any liability rests. The general rule, where the suit is for professional services, is that to make out a case the plaintiff must show that the professional work was done and that he was employed by the defendants to do it. “ It is not enough merely to prove that the work was performed, because it may have been without authority or may have been upon the employment of some person other than the defendants.” Wright v. Fairbrother, 81 Me., 39.
We have not been shown any statute which provides for any apportionment of the Choctaw funds to the Mississippi Choctaws as a group, body, or class. On the contrary, the right accorded by the statutes authorizing the enrollment of Choctaws living in Mississippi upon their removal to and residence in the Choctaw country is in each case an individual right. The law declares that “ any Mississippi Choctaw *331 duly identified, etc., shall have the right * * * to make settlement within the Choctaw-Chickasaw country and on proof of the fact of bona fide settlement may be enrolled * * * as Choctaws entitled to allotment.” Act of May 31, 1900, 31 Stat., 236. True, a separate roll of Mississippi Choctaws is required by section 41 of the supplemental Choctaw-Chickasaw agreement, 32 Stats., 641, but section 42 of that agreement provides that “when any such Mississippi Choctaw shall have in good faith continuously resided upon the lands of the Choctaw and Chickasaw Nations for a period of three years * * * he shall upon due proof * * * receive a patent for his allotment, as provided in the Atoka agreement, and he shall hold the lands allotted to him as provided in this agreement for citizens of the Choctaw and Chickasaw Nations.” Section 43 of said agreement requires personal application for enrollment except that a father may apply for his minor children and a husband may apply for his wife.
To sustain, the issue on their part Winton and associates urge that a large number of contracts were made by Winton and his associates with individual Mississippi Choctaws after June, 1896. The said petitioners claim that these contracts comprehended the interests of many more Mississippi Choctaws; that Winton went to Mississippi in 1896 and visited every Choctaw neighborhood, advising the Choctaws of their rights; that they prepared and caused to be presented a number of memorials to Congress setting forth the claim or rights of the Mississippi Choctaws; that they actively urged certain legislation favorable to the Mississippi Choctaws and opposed legislation as unfavorable to them at divers times between 1896 and 1906; that Winton addressed a circular letter to the Mississippi Choctaws wherein he informed them of his activities in their behalf; that the Mississippi Choctaws accepted the results of their labors, and should be held to have impliedly, at least, agreed to pay the reasonable value of such services.
Do the facts establish the liability alleged, or any liability %
That Winton made a large number of contracts with individual Mississippi Choctaws is definitely shown. By the *332 act of June 10, 1896, the United States Commissioner to the Five Civilized Tribes was instructed to make up a roll of members of the said five tribes with a view to the allotment of the land of said five tribes among the membership thereof; and directly after the passage of that act a contract, which was subsequently modified, was made between Mr. Winton and Mr. Owen. By the modified contract, dated July 24, 1896, it was provided that Winton should act as attorney in the Mississippi Choctaw cases under agreement with Mr. Owen; that the latter had a one-half interest in the contracts, and in the event of any accident to Winton he had full authority to take them up in place of Winton. Thereupon Winton proceeded to Mississippi, traveled throughout the State, and procured the contracts of a large number of persons—Mississippi Choctaws, beginning with Jack Amos. Some of these contracts were taken in his own name; some in the name of C. E. Daley, an attorney belonging to the firm of Logan, Desmond & Harley, of New York City, who was acting for and in behalf of Winton; some were taken in the name of Mr. Owen, but all of them occupied the same relation as if they had been made in the name of Winton. These contracts provided that Win-ton should receive one-half of the net recovery, and gave him a large measure of control over the property when secured.
The condition of the contracting Indians is stated in Winton’s amended petition, as follows:
“At the time of the making of the contracts by Charles F. Winton with the Mississippi Choctaws in 1896, the Mississippi Choctaws were extremely poor, working at manual labor, making fences, picking cotton, chopping wood, and having no landed estate or personal property worth mentioning. Their children could not attend schools provided for the whites; they were subject to a species of vassalage, not permitted to leave their employers’ service while under indebtedness, which operated as a kind of peonage; were not allowed to vote or to exercise the rights accorded the citizens of Mississippi, and were otherwise in a state of helplessness, both financially and socially.”
As above stated, after the passage of the act of May 31, 1900, providing “That all contracts or agreements looking *333 to the sale or encumbrance in any way of the lands to be allotted to said Mississippi Choctaws shall be null and void,” Winton proceeded to secure other new contracts.
All of the contracts were with individual Indians, and upon what theory it can be asserted that because a large number of said Indians made contracts with Winton or Daley other Indians not so contracting became affected or bound by them it is difficult to perceive. They did not constitute a tribe or band, and had no tribal organization or government. The State laws had looked to the abolishment of any tribal or Indian government among them. They were citizens, and by contracting with them Winton admitted their power to contract. As late as February, 1906, as appears from the contract between Mr. Owen and Mr. Boyd, one of the associates named in Winton’s petition, there is a reference to said contracts as being with “ various individual Mississippi Choctaws.” If the Mississippi Choctaws were “in a state of helplessness, both financially and socially,” the fact but reinforces the conclusion that those who did not undertake or contract with Winton and his associates should not be held to be bound by the act of those who did contract.
That Winton went among the Mississippi Choctaws is shown by the findings; but it is not shown, except by the contracts they made, who of them employed him or his associates to represent them. Having the right of contract many could and did abstain from contracting with him.
Nor can any implied undertaking by the Indians be raised up from the fact that Winton prepared or presented memorials to Congress in the name of the Mississippi Choctaws and that he sent out a circular letter addressed to the Mississippi Choctaws containing an account of his work.
The first memorial in December, 1896, is in the name of individuals who had employed Winton. The second in January, 1897, purports on its face to be a petition for the enrollment of those whose names are stated and they were clients of Winton. The third “Memorial and petition” September, 1897, purports to be on behalf of the Mississippi Choctaws and is signed “ C. F. Winton, counsel.” It is an argument upon the rights of the Mississippi Choctaws, the *334 burden of which is to show that said Indians were entitled to participate in the Choctaw estate, except annuities, and remain in Mississippi and in bold type asks, “ Why should they be compelled at all to move to the West?” However beneficial this view may have been to his clients if adopted, it was contrary to the course of legislation adopted.
The fourth memorial, February, 1900, was a “ petition of the Mississippi Choctaws ” introduced in the House by Mr. Williams of Mississippi, and is signed, “The Mississippi Choctaws, by C. F. Winton, Logan, Desmond & Harley, attorneys for petitioners.” The petitioners are described 'as “full-blood Choctaw Indians speaking the Choctaw language, citizens of the Choctaw Nation, residing in Mississippi,” and the petition renews the argument that they are entitled to remain in Mississippi and enjoy participation in the Choctaw estate west. It concludes with a prayer that they be sent to the courts “ where this controversy may be settled without delay.”
The memorial of April, 1900, is principally addressed to the question that the law should provide more specifically for their enrollment upon removal, and is signed, your humble servants, the Mississippi Choctaws, “Logan, Desmond & Harley, C. F. Winton, counsel.”
The last memorial, April, 1902, deals with a projDosed change in the statutes relative to identification and enrollment of Mississippi Choctaws and purports to be a petition of the Mississippi Choctaws, being signed, “ The Mississippi Choctaws, by C. F. Winton, Eobt. L. Owen, counsel.” In addition to these petitions or memorials, it appears that in 1898 Winton addressed a circular letter “ to the Mississippi Choctaws,” which is set out in the amended petition. Without stopping to examine the accuracy of his statements or to inquire whether under the principle announced in Trist v. Child, 21 Wall., 441, compensation could be awarded, for “ getting Senator Walthall to pass a resolution through the Senate,” or “ soliciting Mr. Allen, of Mississippi, to prepare it,” or because “by the help of Mr. Williams and Senator Walthall and Mr. Allen ” an “ item was put in the Indian appropriation act,” it is sufficient to say that the proof does *335 not show who of said people received said letter or to how many of them it was sent. Who of them did or could read it? If sent to all it would not impose any liability upon its recipients, without more. The relation of attorney and client can not be created by the attorney notifying an indefinite number of people that he is working for legislation in their interest. Winton knew he had a large number of contracts which at that time had not been nullified by law, and it is reasonable to suppose he desired others. The statement in his letter of the importance of certain proof in the matter of enrollment and that he had secured a list of claimants who were descendants of fourteenth-article claimants which he would make available to his “ clients as soon as practicable,” can as reasonably be construed to be a suggestion to the Indians to become his “ clients ” as it can be said to have been a disinterested act in their behalf.
The memorials of “ the Mississippi Choctaws ” and Win-ton’s said letter together do not create the relation of attorney and client between Winton and the Indians who did not employ him. Winton was retained by a number of Mississippi Choctaws under contracts which he was diligent to procure. That he represented his clients may be conceded. He was “ counsel ” or “ attorney ” for his clients and he had the right, as they had it, to use the general designation of the Mississippi Choctaws in presenting his clients’ case. But in so doing he did not become counsel for all of the Mississippi Choctaws. Those not contracting with him could be silent and not be bound to pay for his services or they could contract, as many did, with other attorneys. If an attorney employed by one concern to present before a committee of Congress an argument in favor of a higher tariff on certain manufactured articles should see fit to urge that “ the manufacturers of this country ” were in need of such legislation, would anybody than his client be bound to compensate him ? If he notified them by circular or through the press that he intended to speak or act in behalf of all of them would “ the infant industries ” be saddled with his fee upon the principle of qucmtwm merwit? I think not.
*336 The theory advanced in argument that Winton is equitably entitled to compensation because of his efforts in behalf of the Mississippi Choctaws which are alleged to have resulted in securing to them a great estate is not tenable. There is no analogy between the estate belonging to Mississippi Choctaws or in which they are severally interested and a trust fund brought into a court for administration. The rights of Mississippi Choctaws in the Choctaw Nation and estate were not cognizable by any court, but were subjects of legislative action. To pay for services of attorneys rendered in or about the procuring of legislation deemed needful or desirable to said Indians upon such theory would be. an undue extension of the trust-fund doctrine. When, through the efforts of a complaining party (who, generally speaking, sues on behalf of himself and all others similarly situated who will come in and bear their proportion of the expenses of the litigation) a court of equity brings within its control a fund which the defendants are seeking to divert or in breach of a trust are attempting to withhold from those entitled to participate in it, the court may distribute the fund so realized. Upon the principle that “ a trust fund should bear the .costs of its administration,” it is allowable to pay out of the estate the costs and expenses of the complaining party under whose bill the court acquires jurisdiction and decrees relief. These costs and expenses include reasonable attorney’s fees to the solicitor of the complainants. Trustees v. Greenough, 105 U. S., 527. But the solicitor’s right to compensation is worked out through the equity of his client against the other parties who come in and participate in the fund, it being considered unjust that one complainant should bear personally all the expense of the litigation, the favorable termination of which enures to the benefit of all. Aside from the rights of his client, the solicitor, generally speaking, has no independent claim upon the trust fund, and the petition for his compensation is generally made in his client’s name. In exceptional cases the solicitors may intervene in their own behalf. Central Railroad & Banking Co. of Georgia v. Pettus. 113 U. S., 116.
*337 Whatever the service actually rendered was, Winton did not create a trust fund. It was already in existence and was under the management and control of the United States. They are still the trustees, and the trusteeship has not changed except to the extent that allotments in severalty may have changed it. At no time was the right of fourteenth article claimants under the treaty of 1830 to remove to and become citizens of the Choctaw Nation denied. The procedure which they should adopt to accomplish that end was long delayed, but the trust was never violated by the trustee. The efforts of Mississippi Choctaws through their counsel to establish a right for them to participate in the Choctaw estate and remain in Mississippi were not successful. Removal west was made a condition precedent to their participation in said estate, and the statutes recognized that condition. Any charge upon the trust estate must be made in the forum which administers it and not by a court which has no control over it.
In several cases under special jurisdictional acts this court has been called upon to determine the compensation which attorneys should receive, payable out of funds due Indians. In the Ute Indians case, 45 C. Cls., 440 ; 46 Ib., 225, the jurisdictional act directed the court to set apart just and reasonable compensation to the attorneys on behalf of the plaintiffs, and authorized an appearance therein by an attorney for the Indians. In the Sisseton and Wahpeton Indians case, 42 C. Cls., 416, the act provided for the ascertainment of reasonable attorneys’ fees, to be paid to the attorneys for the Indians for services rendered in said case. In the Eastern Cherokee Indians case, 40 C. Cls., 252, it was provided that the prosecution of the suit on the part of the Cherokees should be through attorneys employed by their proper authorities, their compensation for expenses and services rendered to be fixed by the Court of Claims upon the termination of the suit.
But the acts involved in those cases declared a liability, authorized the court to ascertain the amounts due, and directed their payment out of the fund in question.
*338 In the Butler & Vale case, 43 C. Cls., 497, involving the claim of the Colville Indians, the court did not in terms hold that the act there considered defined a liability to the attorneys. The act is very different in terms from the acts involved in this case.
Any rights of Winton must therefore rest upon contract, express or implied, with the Mississippi Choctaws made defendants to this proceeding in his petition. No express contract is shown or claimed. None can be implied from the circumstances above referred to or relied upon by Winton. The employment by some Mississippi Choctaws was not an employment by all of the Mississippi Choctaws. Those who did not employ Winton had just the same privilege of employing other agents as his clients exercised in employing him, and many of them did so. The “ new borns ” employed no one, and could not do it, nor are they or their interests bound upon any theory of representation.
It remains to consider the contention that the Mississippi Choctaws accepted the benefits and fruits of Winton’s labors in behalf of the Mississippi Choctaws, “ secured great estates thereby,” and “ upon the principle of quantum meruit” should be held to have impliedly agreed or consented to pay therefor. Mississippi Choctaws became entitled to allotments in severalty and to participation in the Choctaw estate upon their being identified and enrolled. They must needs remove from Mississippi and take up a bona fide residence in the Choctaw-Chickasaw country. They were not required to act as a “body” or “group,” but the act of identification, removal, and allotment called for individual action and volition. They applied for identification as individuals, and were identified as such; they were enrolled as individuals, and as individuals they received allotments of land in severalty. They were neither identified nor enrolled at one or the same time; nor were they allotted lands together. Each of them upon complying with the provisions of the statutes in that regard became a citizen of the Choctaw Nation entitled to all the rights, privileges, and immunities of Choctaw citizenship, except that they could not participate in Choctaw annuities. This exception probably furnished the occasion for the provision in the statute *339 that the Mississippi Choctaws should be carried “upon a separate roll.” Some few may have removed at their own expense; many were removed at the expense of the Government, which appropriated $20,000 for that purpose. Many more were removed by and at the expense of divers persons who have intervened in this proceeding. A comparatively small number were removed to Indian Territory through the instrumentality of Winton, and no claim is made by Winton and his associates for that expense.
The right to apply for identification, to be identified, to be enrolled, and ultimately to participate in the Choctaw estate, is one thing, involving different steps; and the possession and enjoyment of the estates granted is a different thing. It was the fact of removal to Indian Territory, the fact of being identified and subsequently enrolled, that actually fixed their status under the law. In these things Winton did not participate, and he makes no claim for any of them. He does, however, claim that he should be compensated for his services during a number of years while, as alleged, he was advocating or defending before the legislative body or its committees and others the rights of the Mississippi Choctaws. And without stopping at this point to question the accuracy of his claim, but merely stating it he claims that his efforts resulted in the legislation which made possible the enjoyment of a great estate, and that consequently by accepting said estates the Mississippi Choctaws should be held to have assumed a liability to pay for said service upon the principle of quantum meruit.
As above suggested, it was as important to the said Indians that active measures be adopted to provide for their removal to and enrollment in the Choctaw country as it was to have legislation authorizing their removal. To hold that a people who, in the main, were destitute and ignorant of their rights, could by the mere act of exercising a legal right assume a liability, the extent and measure of which they could not know, would be unreasonable. A fatal defect in the contention lies in its failure to note the distinction between accepting the benefits of Winton’s alleged labors and accepting the benefits of the law itself. Between his alleged labors and the enjoyment of said estate there were the neces *340 sary steps of identification, removal, and enrollment, and also the law itself by which benefits were secured. The statutes conferred the rights and extended the benefits of which the Indians availed themselves, and they did not by the mere act of exercising their legal rights become debtors to Winton.
It is probable that many of the Mississippi Choctaws who secured allotments never heard of Winton’s alleged services. To be chargeable at all upon the theory of accepting the benefit of one’s labors the party sought to be charged must be free to take them or not. There being no prior contract, express or implied, between the parties it can not be said that the acceptance and pursuit of rights accorded by the statutes are a voluntary acceptance of services rendered by an attorney in or about the enactment of the statutes. The party sought to be charged does not have to forego the benefits conferred by the law or accept them at the expense of a liability for services rendered prior to the enactment of the law. The acceptance by the Mississippi Choctaws of the right to identification, enrollment, and allotments does not of itself and without more create any liability against them upon the principle of quantum meruit. It is a familiar principle that a man can not be forced to pay for what he has had no opportunity to reject. Coleman v. United States, 152 U. S., 96; Boston v. Dist. of Columbia, 19 C. Cls., 31; 9 Cyc. 252. The rule that the party sought to be charged with taking the benefits of an attorney’s services “ must be free to take them or not” finds illustration in Parshley v. Church, 146 N. Y., 583. In that case the plaintiff sued the church for professional services rendered. He had been employed by a minority of a board of trustees to present and prosecute charges against the pastor, and succeeded in his efforts in causing the pastor’s suspension. Thereafter the church instituted proceedings to remove the pastor from the parsonage, and in resolutions authorizing such proceedings it was recited that the pastor had been removed under said charges. The plaintiff urged, among other things, that the church had thus accepted the result of his services and should pay for them, but the court held otherwise, upon the principle above stated.
*341 Unless the relation of attorney and client or some contractual relation existed between the defendant Indians and Winton at or before their enrollment, it can not be said to exist at all so far as this proceeding is concerned, and no such relation is shown. Meeting the conditions and complying with the requirements of the statutes, each of the Mississippi Choctaws was lawfully entitled to participate in the Choctaw estate without let or hindrance from those who claim to have promoted or suggested or aided in said legislation. As each of them under the circumstances stated was free to act under the law a court can not place itself, so to speak, at the entrance to the said western country and say to said people that though they had a perfect legal right to enter they could only do so upon the payment to Winton of whatever sum the court might determine he deserved to receive from them for services performed prior to the enactment of the statute, or that having done so they assumed a liability. This would be like placing an embargo on the law. The statutes do not authorize such a limitation on the rights of the Indians, and the court can not place any. They accepted benefits authorized by the law.
Upon the said list of enrolled Mississippi Choctaws there are 1,578 individual names and a description of the lands allotted to each. Winton had contracts with 696 of these, and he assisted in the removal of a small number of those with whom he contracted. In said list are the names of 137 enrolled under the terms of the statute as “new-boms.” They were infants in fact, and many of them were probably not born when any of the services claimed for were performed. They constitute part of the Mississippi Choctaws who were enrolled and are named along with others as defendants in this proceeding. They did not and could not contract with Winton, and the mere act of accepting their patrimony could not raise up a liability on their part to Winton either as individuals or as members of a supposed group. But upon a claim asserted and maintained against the Mississippi Choctaws as a body or group these would have to be bound by the judgment, if any were rendered.
It is no answer to these views to say that Winton and his associates have received nothing for the services which they *342 allege were responsible for the benefits secured to the Mississippi Choctaws. Winton’s original idea was that he should contract with individual Mississippi Choctaws, and he did so. That the contracts he made were subsequently declared void may have been his misfortune, but he changed their form and made other contracts, evidently recognizing that the surest way of creating the relation of attorney and client is by express contract. As to whose fault, if any one’s, it was that more of his clients did not become enrolled and secure allotments of land, it is not necessary to inquire. More than one-third of the total enrollment had contracted with him in one or the other forms of contract exhibited in this proceeding. He had the right to contract with said people, and the law would furnish him a remedy to enforce valid undertakings. The facts, however, do not show a liability to him and his associates “against the Mississippi Choctaws ” sued in this proceeding. The jurisdictional acts do not create any liability against them. Green v. Menominee Indians, 283 U. S., 558.
It follows that the petitions should be dismissed.